IN THE

# United States Court of Appeals

## For the Second Circuit

————

AUGUST TERM 2024

ARGUED: MARCH 5, 2025
DECIDED: JULY 9, 2025

No. 24-1040

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

PATRICE RUNNER,

*Defendant-Appellant.*

————

Appeal from the United States District Court
for the Eastern District of New York.
18-cr-00578 – Joanna Seybert, *District Judge.*

————

Before: CALABRESI, CHIN, and MERRIAM, *Circuit Judges.*

————

From the 1990s through the 2010s, Patrice Runner ran a mass-mailing enterprise that used false and misleading advertising to sell purportedly supernatural objects and psychic services. For his role in the enterprise, a jury convicted Runner of mail and wire fraud, among other crimes. On appeal, Runner contends that his convictions must be vacated because the Government's theory of fraud was legally defective. This error, Runner argues, infected (1) his indictment, (2) the sufficiency of the evidence, and (3) the jury instructions. Following the Supreme Court's recent decision in *Kousisis v. United States*, 145 S. Ct. 1382 (2025), we reject Runner's arguments. We further hold that any error committed by the district court at sentencing in estimating the loss caused by Runner's enterprise was harmless. We therefore AFFIRM.

---

ALLEGRA GLASHAUSSER, Federal Defenders of New York, Inc., New York, N.Y., *for Defendant-Appellant Patrice Runner*.

JOHN W. BURKE, Assistant Director, Consumer Protection Branch (Bryan M. Boynton, Principal Deputy Assistant Attorney General, Civil Division; Burden Walker, Deputy Assistant Attorney General, Civil Division; Amanda N. Liskamm, Director, Consumer Protection Branch; Ann Entwhistle, Trial Attorney, Consumer Protection Branch; Charles B. Dunn, Trial Attorney, Consumer Protection Branch, *on the*

*brief*), U.S. Department of Justice, Washington, D.C., *for Appellee United States.*

_____

CALABRESI, *Circuit Judge*:

From the 1990s through the 2010s, Patrice Runner ran a mass-mailing enterprise that used false and misleading advertising to sell purportedly supernatural objects and psychic services. Over one million customers across the United States and Canada paid for rare gems and objects that were in fact junk, and for personalized psychic services that were never rendered. For his role in the enterprise, a jury convicted Runner of mail and wire fraud, among other crimes. On appeal, Runner contends that his convictions must be vacated because the Government's theory of fraud was legally defective. Because we disagree, we affirm.

**I**

Starting in the early 1990s, thousands of people in the United States and Canada received letters purporting to be from a renowned psychic, Maria Duval.[1] The letters claimed Duval had a vision about the particular recipient and said that the recipient might soon receive a windfall. To help secure that windfall, the

_____

[1] This being an appeal from a criminal conviction, we construe the evidence in the light most favorable to the Government. *United States v. Gasperini*, 894 F.3d 482, 485 (2d Cir. 2018).

letters asked the recipient to fill out a questionnaire so that Duval could conduct a complete psychic reading.

Those who returned the questionnaire received as a response a sixteen-to-eighteen-page document that purported to be a psychic reading by Duval. The response included an additional request, also claiming to be from Duval, for $40 in exchange for a yet more thorough reading.

Thereafter, customers who answered got dozens of different mailings offering a fantastical array of supernatural goods and psychic services. These ranged from mystical ceremonies, to ancient crystals, and to charms that guaranteed good luck. Each item cost around $45. These offerings, the mailings assured, would alleviate the customer's suffering—whether it was financial hardship, romance troubles, or familial strife.

But these were all lies. There was no psychic who had read the customers' letters (or cashed their checks).[2] It was Patrice Runner and his business, Direct Marketing Concepts ("DMC")[3]—the mass-mailing enterprise he had founded in

---

[2] The Government has not tried to define what a "psychic" is. Because that term may mean different things to different people, we also do not attempt to define it. A common dictionary definition of the word is: "a person apparently sensitive to nonphysical forces." *Psychic*, MERRIAM-WEBSTER (11th ed. 2020). For interesting discussions of the overlap between psychics and the law, *see generally*, *e.g.*, Jeremy Patrick, *Faith or Fraud: Fortune-Telling, Spirituality, and the Law* (2020); Catherine J. Ross, *Incredible Lies*, 89 U. Colo. L. Rev. 377 (2018); Christine A. Corcos, *The Scrying Game: The First Amendment, the Rise of Spiritualism, and State Prohibition and Regulation of the Crafty Sciences, 1848-1944*, 38 Whittier L. Rev. 59 (2017).

[3] DMC changed its name to Third Millennium Group in the late 1990s, and then to Infogest Direct Marketing in 2001. We refer to the enterprise as DMC throughout.

Montreal, Canada—that did all that. Duval had sent nothing, though she was, in fact, a real person who lived in France and had a reputation as a psychic.[4] DMC did have a licensing agreement with Duval that permitted DMC to use her name and likeness, but she was not actually involved in any of the mailings. So, for about two decades, DMC mailed around one-hundred different promotions to hundreds of thousands of people throughout the United States and Canada.

## A

The enterprise worked as follows: First, Runner would obtain a list of names and addresses of people who had been customers of other mail-order businesses. He tended to rent lists of people who were lower income and over age fifty-five. Next, DMC would send each of these potential customers a "lead generator" mailing. These were the mailings that claimed that Duval had had a vision about the recipient. In all respects, they appeared to be from Duval—they contained letters that were signed at the bottom in Duval's name, and they enclosed a return envelope listing Duval as the addressee. And, along with a questionnaire, these mailings asked the recipient to send between zero and $20.

Then, those who responded would receive a sixteen-to-eighteen-page psychic reading, what DMC called a "conversion pack." DMC created these conversion packs by inputting the questionnaire answers into a computer. The resulting document contained some text that was the same for all conversion packs and some text based on the particular questionnaire answers.

---

[4] Online sources indicate Duval may have died in 2021.

Finally, follow-on promotions offering supernatural goods and psychic services were sent. These offerings (called "back-end" mailings) were all misleading. Instead of the assertedly rare and valuable objects advertised, customers received mass-produced trinkets. And when a customer paid for a psychic service, DMC staff would either do nothing or send back something generic. In total, there were about sixty different back-end mailings. So long as a recipient continued to respond to the mailings, they would continue to receive them.

Each of the letters in DMC's psychic-promotion campaign claimed to be from one of several psychics. Although Maria Duval was the most common name used in the letters, others claimed to be from psychics named Francoise Laure, Irma Horvath, and Patrick Guerin. But other than Duval's licensing agreement, none of these psychics were involved with DMC. They did not write the letters, fulfill any purchases, or review customer responses.

Over its approximately twenty-year lifespan, DMC brought in more than $150,000,000.

**B**

The DMC mailings can be roughly broken into two categories: mailings offering psychic services and mailings offering tangible objects.

The psychic-services mailings claimed that, for a fee, Duval would provide psychic assistance or would send back psychically powerful information. For example, one letter claimed to foresee luck in the recipient's future, including a large influx of cash. Gov't App'x 382-83. It said that Duval was

"sending . . . positive vibrations" for luck, and it included a charm that was meant to increase the recipient's luck. Gov't App'x 384-85. The letter also directed the recipient to fill out an attached order form, requesting $45, to receive a "Special List of your Lucky Days" along with a "free" list of "Personal Lucky Numbers for Games of Chance." Gov't App'x 384-89.

Another letter claimed that Duval had received a flash of clairvoyance revealing that the recipient would receive nearly $300,000. Gov't App'x 395. It asked the recipient to fill out a questionnaire so that Duval could complete a "Special Reading for Wealth and Happiness In Your Future!" Gov't App'x 397-98. This "Special Reading" would inform the recipient about how to receive the windfall. Gov't App'x 397-98. It then said that Duval would, for free, undertake a "Grand Esostatic Protection Ritual" to ensure that the recipient would receive the money. Gov't App'x 400. The attached form requested $45 in exchange for the "Special Reading." Gov't App'x 401.

The tangible-object mailings were structured similarly but offered objects instead of psychic services. For example, one letter offered the recipient a "Vibratory Crystal" that would bring positive energy as well as luck in games of chance. Gov't App'x 470-71. A crystal with "vibratory powers," it claimed, would be "at least 5 million years old and possess certain specific characteristics." Gov't App'x 471. The letter asserted that Duval had received a box of such crystals from "a small village in a remote part of Paraguay," and that one crystal had arrived labeled with the letter-recipient's name. Gov't App'x 471-73. An attached form requested $45 for Duval to "program" and send the Vibratory Crystal. Gov't App'x 477. The letter also included a certificate, in which an "expert Gemologist"

stated that the crystal "is indeed authentic, 5 million years old and possesses vibratory powers." Gov't App'x 469. In reality, the crystals were purchased from PartyMart (a bulk goods store) and came from China.

Yet another letter informed the recipient about "the Ring[s] of Re," rings that provide protection and luck. Gov't App'x 339. It represented that the rings were "finished with 8 mils thick of pure, high quality gold" and set with "a ONE FULL-CARAT, genuine, fully faceted and hand polished Midnight Blue Sapphire that [Duval] just brought back from the Ilakaka sapphire mines in Madagascar." Gov't App'x 340-41. The enclosed order form had spaces for the recipient to order one, three, or five "genuine One-Carat Sapphire Rings of Re" for $19, $35, or $50 respectively. Gov't App'x 344. Like the Vibratory Crystals, the Rings of Re came from China via PartyMart. DMC had bought the Rings of Re for $2.81 each.

## C

After nearly two decades of business, DMC stopped its mailing campaign in 2014 when the Government brought civil actions against it and its associated entities. And in 2018, a grand jury indicted Runner on one count of conspiracy to commit mail fraud and wire fraud (18 U.S.C. § 1349); twelve counts of mail fraud (18 U.S.C. § 1341); four counts of wire fraud (18 U.S.C. § 1343); and one count of conspiracy to commit money laundering (18 U.S.C. §§ 1956(a)(2), (h)).

Runner moved to dismiss the indictment. He argued that the indictment failed to state a legitimate theory of mail and wire fraud because it did not sufficiently allege that Runner had intended to harm DMC's customers. The district court denied the motion, and Runner went to trial.

The trial lasted ten days; at the end, Runner challenged the jury instructions. Over Runner's objection, the district court had removed from the instructions a paragraph that it had previously included and that focused on an intent-to-harm requirement in the mail and wire fraud statutes.

The jury convicted Runner on fourteen counts and acquitted him on the remaining four. Specifically, it found him not guilty on four of the twelve mail fraud charges but guilty on all the other counts.

Runner moved for a judgment of acquittal or for a new trial. He argued that notwithstanding the Government's proffered evidence of deceit, the Government had not presented evidence adequate to establish the intent-to-harm requirement as mandated by this court's cases. The district court rejected this argument and denied Runner's motion.

The Probation Office's presentence report ("PSR") calculated the loss caused by Runner's business to be more than $150,000,000, which, under the Sentencing Guidelines, added twenty-six levels to Runner's offense level. This resulted in a Guidelines-recommended sentence of life in prison. But statutory maximums capped the recommended sentence at 240 months' imprisonment on each count of conviction (a total of 3,360 months if the sentences were imposed consecutively). Runner objected to the loss calculation, arguing that it had failed to account sufficiently for the counts on which he was acquitted.

At sentencing, the district court rejected Runner's argument and concluded that Runner was, in fact, accountable for a loss of more than $150,000,000. The court adopted the PSR's calculation of the Guidelines recommendation. But, the

court said, the Guidelines-recommended sentence was "way, way off," and it sentenced Runner to ten years' imprisonment, followed by three years of supervised release. Special App'x 208. Runner timely appealed.

## II

Runner argues that his prosecution was premised on a legally defective theory of fraud. We disagree. We begin our analysis by (A) discussing recent guidance from the Supreme Court, and we then (B) address Runner's unsuccessful challenges (1) to the indictment, (2) to the sufficiency of the evidence, and (3) to the jury instructions.

## A

Runner contends that the district court failed to follow the intent-to-harm requirement that our court has identified in the mail and wire fraud statutes. According to Runner, because the fact that magic does not exist is obvious, and because his customers otherwise got the hope, mystery, and entertainment they were looking for, his customers suffered no harm. This argument implicates the Supreme Court's recent decision in *Kousisis v. United States*, 145 S. Ct. 1382 (2025), which invalidated some of our court's reading of these statutes.

The mail and wire fraud statutes make criminal the use of the mail or wires to execute "any scheme or artifice to defraud, or for obtaining money or property

by means of false or fraudulent pretenses." 18 U.S.C. §§ 1341, 1343.[5] "The essential elements of mail and wire fraud are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam) (alteration adopted) (quoting *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015)).

"The gravamen of the offense is the scheme to defraud." *Id.* (alteration adopted) (quoting *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016)). To prove a scheme to defraud, the government must prove that the defendant made misrepresentations that were "material," and "that the defendant acted with fraudulent intent." *Id.* (quoting *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)).

Our court broke "fraudulent intent" itself down into two components: "intent to deceive and intent to cause actual harm." *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992); *see United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) ("[A]n intent to deceive alone is insufficient to sustain a wire fraud conviction, [so] misrepresentations amounting only to a deceit must be coupled with a contemplated harm to the victim." (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (alterations adopted and quotation marks omitted))).

---

[5] "Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (per curiam) (quoting *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016)).

With respect to the intent-to-harm requirement, we specified that "the harm contemplated must affect the very nature of the bargain itself." *Starr*, 816 F.2d at 98. Accordingly, we summarized our cases this way:

> Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.

*United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007). Pursuant to this principle, we invalidated fraud convictions for failure to establish fraudulent intent. *See, e.g.*, *id.* at 109; *Starr*, 816 F.2d at 98; *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970).

But after oral argument in this case, the Supreme Court decided *Kousisis v. United States*, and in that case accepted a theory of fraud that our court had rejected.[6] In *Kousisis*, a defendant and his painting business were convicted of wire fraud. 145 S. Ct. at 1388-89. The defendant had secured a contract with the Pennsylvania Department of Transportation (PennDOT) to paint two projects in Philadelphia. *Id.* at 1388. In the contract, and in accordance with PennDOT and federal requirements, the defendant represented that his painting business would acquire millions of dollars in painting supplies from "a prequalified

---

[6] Although *Kousisis* was decided after oral argument in this case, the existence and significance of that case were noted in Runner's opening brief, *see* Appellant's Br. at 42 n.4, at oral argument, Oral Argument at 3:46-4:45, and in a Rule 28(j) letter submitted by Runner dated June 24, 2025, ECF No. 49.

12

disadvantaged business." *Id.* at 1389. In reality, the defendant and his business used the prequalified disadvantaged business as a mere pass-through entity that "funnel[ed] checks and invoices to and from [the painting business's] actual suppliers." *Id.* For this scheme, the defendant and his business were convicted of wire fraud and conspiracy to commit wire fraud. *Id.*

The government secured the convictions under what the Supreme Court called "the fraudulent-inducement theory." *Id.* at 1388. As the Court explained, the fraudulent-inducement theory "supports liability for federal fraud anytime a defendant uses falsehoods to induce a victim to enter into a transaction." *Id.* at 1391 (alteration adopted and quotation marks omitted). The *Kousisis* defendants argued that this theory was inadequate to support federal fraud liability because it did not require proof that the defendant "aim[ed] to inflict economic loss" (*i.e.*, to cause a net pecuniary loss). *Id.*

The Supreme Court rejected the defendants' argument and held that the government did not need to prove economic loss to convict under the mail and wire fraud statutes. *Id.* at 1395. Going further, the Court also endorsed the fraudulent-inducement theory. The Court held that "[t]he fraudulent-inducement theory is consistent with both the text of the wire fraud statute and [the Court's] precedent interpreting it." *Id.* at 1391; *see also id.* at 1392 ("A conviction premised on a fraudulent inducement thus comports with § 1343."); *id.* at 1394 n.5 ("[A]

fraud is complete when the defendant has induced the deprivation of money or property under materially false pretenses.").[7]

By embracing the fraudulent-inducement theory, the Supreme Court erased the "fine line" that our court had drawn in excluding certain inducement schemes from the mail and wire fraud statutes. *See Shellef*, 507 F.3d at 108. Whereas we had said that schemes that "do no more than cause their victims to enter into transactions they would otherwise avoid" are not criminal under the mail and wire fraud statutes, *id.*, the *Kousisis* Court held that those statutes make criminal schemes in which the defendant "intentionally [lies] to induce a victim into a transaction that will cost her money or property," *Kousisis*, 145 S. Ct. at 1398. Thus, contrary to cases in which we have said otherwise, "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a contract that requires handing over her money or property." *Id.* at 1388.[8]

---

[7]   In separate opinions, two Justices took issue with the Court going beyond rejecting the economic-loss argument. *See Kousisis v. United States*, 145 S. Ct. 1382, 1411 (2025) (Sotomayor, J., concurring in the judgment) (rejecting the economic-loss requirement but declining to join the majority "to the extent [it] appears to speak more broadly"); *id.* at 1406 (Gorsuch, J., concurring in part and concurring in the judgment) (stating that portions of the majority's analysis vitiated limits on fraud acknowledged by common-law courts). According to these Justices, the majority's embrace of the fraudulent-inducement theory was "not essential to the Court's resolution of the dispute before [it]," *id.* at 1412 (Sotomayor, J., concurring), and was therefore "dicta," *id.* at 1411 (Gorsuch, J., concurring). But the seven-Justice majority stated that its embrace of the fraudulent-inducement theory was not dicta but instead was "essential to [its] holding." *Id.* at 1394 n.5.

[8]   Of course, to support a mail or wire fraud conviction, any false statement must be material. *See Kousisis*, 145 S. Ct. at 1396. Indeed, the Supreme Court in *Kousisis* described the "demanding" requirement of materiality, *id.* at 1398 (quoting *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016)), as "the principled basis for distinguishing

**B**

With this background in mind, we turn to Runner's challenges.

**1**

Runner contends that his indictment was defective because it failed to allege the intent-to-harm requirement. We disagree.

The Fifth and Sixth Amendments entitle every criminal defendant "to an indictment that states the essential elements of the charge against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000); *see also* Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ."). Thus, an indictment is sufficient if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."

---

everyday misstatements from actionable fraud," *id.* at 1396. Our court has said that "[t]o be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994); *accord United States v. Rigas*, 490 F.3d 208, 231 (2d Cir. 2007). We have also said that "[a] statement is material if the 'misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct.'" *Weaver*, 860 F.3d at 94 (alterations adopted) (quoting *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc)). In a Rule 28(j) letter dated June 24, 2025, *see* Fed. R. App. P. 28(j), Runner argues for the first time that the misrepresentations in DMC's letters were not material. But Runner did not raise this argument in his briefs or at oral argument, and we decline to address it. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (per curiam) ("In making any [Rule 28(j)] submission, a party is strictly forbidden from making additional arguments or from attempting to raise points clarifying its brief or oral argument.").

*United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). "The sufficiency of the indictment is a matter of law that is reviewed de novo." *Pirro*, 212 F.3d at 92.

Here, the indictment alleged that Runner "engaged in a direct-mail operation" that sent letters that "falsely and fraudulently purported to be individualized communications from one or more world-renowned psychics." App'x 21. These letters, the indictment alleged, "induced consumers . . . to pay fees in exchange for purportedly personalized astrological services or for supposedly unique and supernatural objects." App'x 21. It further alleged that instead, "[t]he letters . . . were mass-produced form letters, not from psychics, and the Victims received no services or unique supernatural objects after submitting payments." App'x 21; *see also* App'x 24 ("[T]he purportedly unique and supernatural objects were mass produced trinkets and the psychics did not provide any personalized astrological services or studies.").

Under *Kousisis*, these allegations are plainly sufficient. According to the Supreme Court, "a defendant commits federal fraud whenever he uses a material misstatement to trick a victim into a [transaction] that requires handing over her money or property." *Kousisis*, 145 S. Ct. at 1388. Runner's indictment matches this definition of federal fraud completely. The indictment alleges that Runner and his operation sent letters falsely purporting to be from renowned psychics to trick recipients into handing over money in exchange for personalized services and objects with particular characteristics that made them unique. Going further, it also alleges that customers who purchased personalized services did not receive

16

them, and that customers who purchased such unique objects instead received mass-produced trinkets.

Runner does not dispute that the indictment alleges that he intended to trick his customers.[9]  Instead, Runner argues that the indictment links the intent-to-harm requirement to allegations that "there were no psychics"; no "real psychic, supernatural magic"; and "no supernatural objects."  Appellant's Br. at 46; Appellant's Reply Br. at 9.  Because, he contends, the absence of psychic magic is obvious, those allegations cannot possibly satisfy the intent-to-harm requirement, and the indictment is therefore insufficient.

But, in fact, according to the indictment, the letters Runner sent lied about whom they were from—a renowned psychic—and about what customers would receive—personalized services and unique objects.  And the indictment alleges that Runner's scheme sought to induce customers to pay money.  *Kousisis* held that this is enough to support a charge of mail or wire fraud.  The kinds of lies alleged in the indictment are common in fraud schemes, and they provide no less support for the indictment simply because they appeared in letters with fantastical content.

**2**

Next, Runner contends that the evidence presented at trial was insufficient to support his convictions.  "We review challenges to the sufficiency of evidence

---

[9]  Runner suggests that the indictment was defective insofar as it did not allege that what his customers received was worth less than what they were promised.  But *Kousisis* expressly rejected that proof of net economic loss is required under the mail and wire fraud statutes.  *See* 145 S. Ct. at 1395.

*de novo.*"  *United States v. Pierce*, 785 F.3d 832, 837 (2d Cir. 2015).  We "view the evidence in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility."  *Id.* at 838 (quoting *United States v. Harvey*, 746 F.3d 87, 89 (2d Cir. 2014) (per curiam)).  The jury's verdict must be sustained "if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Runner argues that the Government's theory at trial suffered the same insufficiency as did the indictment: the Government did not introduce evidence that Runner intended to harm his customers.  Again, we disagree.  The Government introduced sufficient evidence to prove that DMC—led by Runner— advertised goods and services it never planned to deliver, and otherwise intentionally lied to trick customers into paying money.  No more was needed for the jury to find fraudulent intent.

To begin, Runner's promotions selling tangible objects provide some of the clearest trial evidence of intentionally false and misleading statements.  The "Rings of Re" promotion, for instance, offered customers rings "finished with 8 mils thick of pure, high quality gold" and set with "a ONE FULL-CARAT, <u>genuine</u>, fully faceted and hand polished Midnight Blue Sapphire that [Duval] just brought back from the Ilakaka sapphire mines in Madagascar."  Gov't App'x 340-41.  The promotion enclosed an order form for the recipient to order one, three, or five "One-Carat Sapphire Rings of Re" for $19, $35, or $50 respectively.  Gov't App'x 344.

But when a customer purchased a Ring of Re, rather than receiving a genuine gold ring with a sapphire that was personally gotten by Duval from Madagascar, she instead got a trinket that had been purchased in bulk from PartyMart for $2.81. True, PartyMart itself advertised these rings as "Ring of Re with Genuine Sapphire." Appellant's Br. at 11 (quoting Gov't Ex. 134). But that's beside the point. A jury can find a defendant acted with fraudulent intent if it finds "there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *Jabar*, 19 F.4th at 77 (quoting *Starr*, 816 F.2d at 98). Here, the jury could conclude from the evidence presented that Runner intended DMC's customers to believe that they were buying a hand-polished gold ring with a sapphire from Madagascar, not mass-produced junk.

Similarly, in another letter, "Duval" wrote that she had travelled to "a completely unknown village (which isn't even marked on the map)" in the Thar Desert in India. Gov't App'x 420. There, the letter said, she met "Shaman Arkashmiri," who offered Duval statues with the power to allow "substantial sums of wealth" to come into its recipient's life. Gov't App'x 421. The letter said that, unfortunately, "this very valuable, powerful, magical statue is not for sale"— but that Duval could "entrust it to [the customer] for one year at the quite ridiculously low amount of only a quarter per day!" Gov't App'x 422. The customer needed only to fill out a form and pay $90 (an apparent discount from the one-quarter-a-day-for-a-year price of $91.25) to receive the statue. Gov't App'x 423. None of this was true, and the statues that were sent came from China.

In short, the jury heard manifestly sufficient evidence that many of these tangible-good promotions were simple schemes in which Runner intentionally advertised one thing but sold another. The promotions advertised valuable, rare items of remarkable provenance—despite Runner knowing the entire time that DMC was selling trinkets and junk. As we have said, when "false representations are directed to the quality, adequacy[,] or price of the goods themselves, . . . fraudulent intent is apparent." *United States v. London*, 753 F.2d 202, 206 (2d Cir. 1985) (emphasis omitted) (quoting *Regent Off. Supply Co.*, 421 F.2d at 1182).

But Runner argues that these tangible-object lies are an inadequate basis upon which to affirm his convictions. In his view, the Government's theory at trial "focused on the fact the objects weren't supernatural, not that they weren't from a particular country" or otherwise were not genuine. Appellant's Br. at 52. His argument is essentially that any misleading statements he made went to the supernatural nature of what he was furnishing, and that assertions concerning the supernatural cannot constitute criminal lies.

In fact, however, Runner's false statements about the origin and character of these tangible objects played a prominent role in the Government's case. In its closing argument, the Government emphasized that many of the letters' assertions about the tangible objects were lies. It argued to the jury that the tangible objects "were not what was described in the letters. They were cheap trinkets bought from PartyMart." App'x 682. Although the Government also highlighted other, "magical" aspects of Runner's offers, the tangible-object lies constituted a notable and sufficient part of the Government's case.

20

Significantly, even Runner's purely psychic-service promotions misrepresented what was being sold. For example, one letter purported to be from psychic Patrick Guerin and offered the performance of "7 great vibratory ceremonies" that would be "tailor[ed] to [the customer's] personal needs."[10] App'x 173. Completion of these ceremonies would "turn [the customer's] life dreams into reality," allowing the customer to "liv[e] the life [they] always dreamed of." App'x 173. The customer needed only to pay $45 and "[w]rite down" and return "the 7 life dreams [they] m[o]st want[ed] to see become reality on . . . two precious parchments." App'x 174-75. But after the customer paid $45 and DMC had received the "precious parchments," no one at DMC did anything—not Guerin nor any other psychic. App'x 174. No one performed any "great vibratory ceremon[y]," much less seven of them. App'x 173.

And even when the customer of a psychic-service promotion did receive something, it was different from what had been advertised. For instance, one promotion had Duval assertedly asking the recipient to fill out a $45 order form to receive a "Special List of your Lucky Days," which would contain *individualized instructions* on how to take advantage of that luck. Gov't App'x 384-89. The jury heard testimony from a customer who filled out the order form. The customer said that she received a document listing lucky days, which she believed was specifically prepared for her by Duval. But other than bearing the customer's

---

[10] To be precise, this promotion also came with a tangible object: a trinket that the letter referred to as a "Sesame of the 7 Virtues." App'x 175-76. But the letter indicated that the customer was paying principally for Guerin to "charge" the Sesame with the ceremonies, so its main offer was of psychic services. App'x 174-75.

name, the document was generic. Neither Duval nor any other psychic had prepared the document for the customer.

In fact, all of Runner's psychic promotions lied about whom the letters were from. Most of the promotions contained letters purporting to be from "Maria Duval," a "medium" and practitioner of "the art of divination and White Magic." Gov't App'x 309. Other letters purported to be from other psychics. But in reality, neither Duval nor any other named psychic was involved in producing these letters. The jury heard that some were written by copywriters, and many were written by Runner himself.

This evidence allowed the jury to conclude that Runner had used these letters to lie "intentionally . . . to induce" potential customers "into a transaction that [would] cost [them] money"—in other words, that he fraudulently induced his customers. *Kousisis*, 145 S. Ct. at 1398. Whatever one might say about advertising and offering the supernatural and whether that could constitute a fraud, a jury could easily conclude that what was advertised and sold here was intentionally false.

Runner resists this conclusion by arguing that his customers got what they were looking for: hope, a sense of mystery, and entertainment. He emphasizes evidence indicating that many of his customers were repeat purchasers. And he highlights testimony from an expert witness who told the jury that the value of some products is experiential and subjective.

But the jury was not required to agree that Runner's customers had received what they bargained for and were therefore not tricked. The jury could reject

Runner's argument and focus instead on the ample evidence that Runner had induced his customers to pay by intentionally lying about what they would receive and from whom they would receive it. As a result, we break no new ground by affirming that Runner's lies could support convictions under the mail and wire fraud statutes.

**3**

Last, Runner argues that the district court erred by giving jury instructions that inadequately conveyed the intent-to-harm requirement, and by omitting two requested instructions about that requirement. We disagree.

"We review de novo a properly preserved challenge to a jury instruction, reversing where the charge, viewed as a whole, either failed to inform the jury adequately of the law or misled the jury about the correct legal rule." *United States v. Capers*, 20 F.4th 105, 116 (2d Cir. 2021) (quoting *Binday*, 804 F.3d at 581-82). If the jury instruction was erroneous, we will affirm only if that error was harmless, that is, only "if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) (quoting *United States v. Mahaffy*, 693 F.3d 113, 136 (2d Cir. 2012)).

In this case, the district court extensively and correctly instructed the jury about the requirement of fraudulent intent. It began by explaining that the first element of mail and wire fraud "is that there was scheme or artifice to defraud victims of money or property by means of false or fraudulent pretenses, representations[,] or promises." App'x 742. After addressing the materiality requirement, the court further instructed: "Fraud requires more than deceit. . . . A

defendant's use of false representations that do not go to the quality, adequacy, or price of goods or services does not constitute fraud." App'x 743.

The court went on to explain that the Government was required to prove that Runner had joined the scheme "with specific intent to defraud." App'x 744. It said: "Intent to defraud means to act knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another. As such, it is not enough for the government to show only that the defendant intended to deceive the victim." App'x 744. Summing up, the court said:

> As a practical matter, then, in order to sustain charges against the defendant on [the intent-to-defraud] element, the government must prove beyond a reasonable doubt that he knew that his conduct as a participant in the scheme was calculated to deceive and, nonetheless, he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another.

App'x 745.

These instructions sufficiently informed the jury about the intent-to-harm requirement. As discussed above, "[b]ecause an intent to deceive alone is insufficient to sustain a [mail or] wire fraud conviction, misrepresentations amounting only to a deceit must be coupled with a contemplated harm to the victim." *Jabar*, 19 F.4th at 76 (alterations adopted and quotation marks omitted) (quoting *Starr*, 816 F.2d at 98). But as the Supreme Court clarified in *Kousisis*, securing a conviction under the mail or wire fraud statutes does not require proof that the scheme intended net economic loss. 145 S. Ct. at 1392. "Instead, a defendant violates [these statutes] by scheming to 'obtain' the victim's 'money or

property,' regardless of whether he seeks to leave the victim economically worse off." *Id.*

This is consistent with the district court's instructions to the jury. The court told the jury that "it is not enough for the government to show only that the defendant intended to deceive the victim"; to establish fraudulent intent, the Government was also required to prove that Runner "act[ed] knowingly and with the specific intent to deceive for the purpose of causing some financial or property loss to another." App'x 744. No more was needed. *Cf. United States v. Chandler*, 98 F.3d 711, 715 & n.2 (2d Cir. 1996) (explaining that an instruction that the Government must prove "an intent to cause a loss" is "a correct explanation of intent to harm" under 18 U.S.C. § 1344(1), the bank fraud statute, which "was modelled after the mail and wire fraud statutes").[11]

Runner also contends that the district court erred by omitting two instructions that the court had previously planned to include. The first was that "an intent to harm a party to a transaction cannot be found where the government's evidence merely indicates that the services contracted for were dishonestly completed." App'x 671. The second was that "the government does

---

[11] The only possible inaccuracies we perceive in the instructions "increase[d] the Government's burden of proof and could not have prejudiced [Runner]." *See United States v. Chandler*, 98 F.3d 711, 714 n.1 (2d Cir. 1996) The district court instructed the jury: "A defendant's use of false representations that do not go to the quality, adequacy, or price of goods or services does not constitute fraud." App'x 743. *Kousisis* held that this proposition is too narrow. There, the Supreme Court recognized that "intentionally lying to induce a victim into a transaction that will cost her money or property" is a "species of fraud." *Kousisis*, 145 S. Ct. at 1398. The Court did not require that these lies go to the quality, adequacy, or price of goods or services.

not establish an intent to defraud merely by showing that the defendant caused customers to enter into transactions they would otherwise avoid." App'x 671. Runner argues that the omission of these instructions meant that the jury was not informed about the intent-to-harm requirement, which was the crux of the defense theory.

It is not at all clear that Runner's requested instructions accurately reflect the law, post-*Kousisis*. But even if they did, the charge as given effectively informed the jury about the intent-to-harm requirement. *See United States v. Prawl*, 168 F.3d 622, 626 (2d Cir. 1999). Runner could—and did—argue to the jury that the Government had failed to establish that requirement. The jury disagreed.[12]

## III

Runner separately contends that the district court erred when calculating his Guidelines range at sentencing. "A district court commits procedural error where it . . . makes a mistake in its Guidelines calculation." *United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (en banc). The Guidelines provide a base offense

---

[12] Runner briefly argues that a different instruction rendered the instructions misleading as a whole. At trial, the Government introduced evidence that, in 2004, the Postal Service pursued administrative action against DMC. The district court instructed that this evidence of "conduct similar to the charges in the indictment" could not be considered "as a substitute for proof that defendant committed the crime charged," but it could be considered to support an inference that Runner had the requisite *mens rea* for these offenses. App'x 738. Runner contends that this misleadingly suggested that Runner's 2004 administrative offense was similar to mail and wire fraud, despite the former violation not requiring an intent to harm. We disagree. The court specifically instructed that the prior acts could not support any incriminating inference other than that "the defendant acted knowingly and intentionally and not because of some mistake, accident or other innocent reason[]." App'x 738.

level of seven for fraud offenses but increase that offense level depending on the amount of loss the defendant foreseeably caused or intended to cause. U.S.S.G. § 2B1.1. Relevant here, the Guidelines instruct sentencing courts to increase the offense level by twenty-six if the loss exceeded $150,000,000. *Id.* § 2B1.1(b)(1)(N).

When determining the amount of loss caused by a defendant's fraud, "[t]he court need only make a reasonable estimate." *Id.* § 2B1.1 Application Note 3(B). "In reviewing the district court's loss calculation, we 'must determine whether the trial court's method of calculating the amount of loss was legally acceptable.'" *United States v. Lacey*, 699 F.3d 710, 717 (2d Cir. 2012) (quoting *United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007)). "We review legal conclusions, such as interpretations of the Guidelines, de novo and findings of fact for clear error." *Id.*

But even if the district court errs in its Guidelines calculation, we will not vacate the sentence if the error was harmless. *United States v. Kent*, 821 F.3d 362, 367-68 (2d Cir. 2016). A procedural sentencing error is harmless if "the record indicates clearly that the district court would have imposed the same sentence in any event." *Id.* (quoting *United States v. Mandell*, 752 F.3d 544, 553 (2d Cir. 2014) (per curiam)).

Runner's PSR calculated the loss caused by DMC to be more than $150,000,000. Accordingly, the PSR noted that the Guidelines recommended a sentence of life imprisonment. But the PSR also acknowledged that the statutory maximum sentences for these crimes capped the Guidelines sentence at 240 months' imprisonment for each crime, or a total of 3,360 months if the sentences all ran consecutively. The district court agreed with the PSR that Runner was

accountable for a loss of more than $150,000,000, and found "the guidelines [sentence] to be as stated in the [PSR]."[13]  Special App'x 224-25.  But the court then said that the Guidelines range was "way, way off."  Special App'x 208.  Taking into account that Runner had profited greatly from the enterprise but had committed "[n]o violence," the court sentenced Runner to ten years' imprisonment and three years of supervised release.  Special App'x 246.

Runner argues that the district court failed to estimate reasonably the loss caused by DMC.  He highlights that the record contained evidence that many of his customers were satisfied with their purchases, and that the jury acquitted him on four counts.  He argues that the district court was accordingly obligated to estimate the proportion of Runner's customers who were not defrauded, and erred by failing to do so.

We conclude that even if the district court's loss estimate was erroneous, that error was harmless because it did not affect the Guidelines recommendation of a life sentence.  The PSR stated that Runner's offense level was 47, which the Guidelines direct is to be treated as the maximum offense level: 43.  U.S.S.G. Ch. 5, Pt. A Application Note 2.  With a Criminal History Category of I and an offense level of 43, the Guidelines recommend a sentence of life.  U.S.S.G. Sentencing Table

---

[13]  At sentencing, the district court noted that the initial PSR recommended a restricted Guidelines sentence of 240 months, but that the PSR had been revised after the Government objected; "[s]o the 240 months [was] corrected to 360."  Special App'x 202.  The revised PSR, however, explained the restricted Guidelines sentence was 240 months on each count, or 3,360 months total if run consecutively—not 360.  Neither Runner nor the Government comments on the district court having said "360," and we assume the court misspoke or was mistranscribed.

for 43/I. Runner does not proffer what he believes to be the correct estimate of the loss he caused. But even assuming the correct estimate was as low as $25,000,001—*i.e.*, just *one-sixth* the amount found by the district court—(and no one suggests it is that low), that would reduce Runner's offense level by only four. *See id.* § 2B1.1(b)(1) (directing twenty-six additional offense levels for a loss greater than $150,000,000, and twenty-two additional offense levels for a loss greater than $25,000,000). That would leave Runner in the exact same place: an offense level of 43, a Criminal History Category of I, and a Guidelines recommendation of life (capped by the statutory maximums of 3,360 months).

In any event, it is clear from the record that Runner's sentence was in no way based on the Guidelines recommendation. After acknowledging the Guidelines, the district court explained that the recommendation was "way, way off" and "incredibly excessive." Special App'x 208, 224. The court then added that it was basing the sentence on "other factors" than the Guidelines. Special App'x 224-25. We are, therefore, convinced that—even assuming that the district court had erred in its loss estimate—"the record indicates clearly that the district court would have imposed the same sentence." *Kent*, 821 F.3d at 367.

None of the cases Runner cites are to the contrary. The district court here did not "repeatedly acknowledge[] the importance of the Guidelines" or use "the Guidelines range in framing its choice of the appropriate sentence." *See United States v. Seabrook*, 968 F.3d 224, 232-34 (2d Cir. 2020). Nor did the court "return[] multiple times to the [Guidelines] range in framing its choice of a . . . below-Guidelines sentence." *See United States v. Bennett*, 839 F.3d 153, 163 (2d Cir. 2016). Instead, this case, like *United States v. Mandell*, is one in which the district court

29

stated that "the Guidelines range was 'wildly out of balance' with the crimes committed by" the defendant and accordingly chose a below-Guidelines sentence. 752 F.3d at 553. We, therefore, conclude that any possible error in the district court's Guidelines calculations was harmless.

## CONCLUSION

For the foregoing reasons, we **AFFIRM**.[14]

---

[14] Runner makes no independent arguments respecting his conspiracy-to-commit-money-laundering conviction, acknowledging that his challenge to that conviction hinges entirely on his arguments against his fraud convictions. Because we affirm his fraud convictions, his challenge to the money-laundering conviction fails too.